**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 10-1482**

NOVELL, INCORPORATED,

             Plaintiff - Appellant,

      v.

MICROSOFT CORPORATION,

             Defendant - Appellee.

Appeal from the United States District Court for the District of
Maryland, at Baltimore.   J. Frederick Motz, District Judge.
(1:05-cv-01087-JFM)

Argued:  March 22, 2011                    Decided:  May 3, 2011

Before SHEDD and DUNCAN, Circuit Judges, and HAMILTON, Senior
Circuit Judge.

Reversed and remanded by unpublished opinion.   Judge Duncan
wrote the majority opinion, in which Judge Shedd joined.   Senior
Judge Hamilton wrote a dissenting opinion.

**ARGUED:** Charles J. Cooper, COOPER & KIRK, PLLC, Washington,
D.C., for Appellant.  David Bruce Tulchin, SULLIVAN & CROMWELL,
New York, New York, for Appellee.  **ON BRIEF:** Jeffrey M. Johnson,
David L. Engelhardt, DICKSTEIN SHAPIRO LLP, Washington, D.C.; R.
Bruce Holcomb, ADAMS HOLCOMB LLP, Washington, D.C.; David H.
Thompson, Howard C. Nielson, Jr., David Lehn, COOPER & KIRK,
PLLC, Washington, D.C., for Appellant.  Richard J. Wallis,

Steven J. Aeschbacher, MICROSOFT CORPORATION, Redmond, Washington; Steven L. Holley, SULLIVAN & CROMWELL, New York, New York; G. Stewart Webb, VENABLE LLP, Baltimore, Maryland, for Appellee.

————————————

Unpublished opinions are not binding precedent in this circuit.

DUNCAN, Circuit Judge:

This appeal arises out of the district court's grant of summary judgment in favor of Microsoft Corp. ("Microsoft") in an action against it by software company Novell, Inc. ("Novell"). Although the underlying lawsuit involves complex issues of antitrust law, the primary question before us is one of contract interpretation: whether a 1996 contract between Novell and a third company divested Novell of its right to bring the present claim. Concluding that Novell retained ownership of the claim, which is not otherwise barred by res judicata, we remand for further proceedings.

## I.

### A.

A detailed discussion of Novell's underlying antitrust action can be found in our prior opinion in this case. See Novell, Inc. v. Microsoft Corp., 505 F.3d 302, 305-10 (4th Cir. 2007). We focus here on those facts necessary to an explication of the parties' present dispute.

Between 1994 and 1996, Novell owned certain "office-productivity" software applications. Id. at 305. These applications included "WordPerfect, a word-processing

3

application, and Quattro Pro, a spreadsheet application."[1]  Id. (footnotes omitted).  During this period, Novell also owned a variety of products comprising its desktop operating system ("DOS") business,[2] including "an operating system known as Novell DOS."  Id. at 306 n.10.

Novell believed, and the Utah Court of Appeals would later find, that its DOS products were "the target of anticompetitive practices by Microsoft in the early 1990s."  Novell, Inc. v. Canopy Group, Inc., 92 P.3d 768, 770 (Utah App. Ct. 2004).  Novell's board of directors was concerned, however, that "if they brought suit against Microsoft in a private antitrust action, Microsoft would retaliate with further unfair practices that could neutralize the value of any antitrust recovery."  Id.  To guard against such an eventuality, Novell sought to effectuate a sale that would obligate the purchaser to sue

---

[1]  Both word-processing applications and spreadsheet applications are computer software.  The former "enables an end-user to create, edit, and print text-based documents," and the latter allows "an end-user to organize and manipulate quantitative data."  Novell, Inc., 505 F.3d at 305 n.2 & n.3.

[2]  "An operating system is software that controls the computer's resources, including memory, disk space, keyboards, and the central processing unit.  An operating system also facilitates communication between the computer's resources and software applications, including word-processing and spreadsheet applications."  Novell, Inc., 505 F.3d at 305 (footnote omitted).

4

Microsoft, allow Novell to share in the recovery, and also obscure Novell's role in the action against Microsoft.  Id.

To that end, on July 23, 1996, Novell executed an Asset Purchase Agreement ("the Agreement") with Caldera, Inc. ("Caldera").  Under the terms of the Agreement, Novell "transfer[red] to Caldera specified assets and liabilities comprising the DOS Business, including the products associated with the DOS Business" and "assign[ed] to Caldera certain related rights and agreements."  J.A. 1963.  In exchange, Caldera paid Novell a purchase price of $400,000.

Novell's sale of assets was designed to divest the company of its various DOS products and assign the rights to any antitrust litigation related to those products.  Specifically, the Agreement provided that "Novell shall grant, transfer, convey, and assign to Caldera all of Novell's right, title, and interest in and to any and all claims or causes of action held by Novell at the Closing Date and associated directly or indirectly with any of the DOS Products or Related Technology."  J.A. 1966-67.  As defined in the Agreement, "DOS Products" included a list of thirteen products,[3] consisting of "seven

---

[3] The thirteen enumerated products were: CP/M, Concurrent DOS, DR DOS 6.0, DR DOS 5.0, Multiuser DOS, Novell DOS 7.0, PALMDOS, GEM, GEM Draw, GEM Wordchart, GEM Graph, GEM Programmers Toolkit, and Draw Plus.

versions of Novell's DOS operating system and six DOS-based software applications." Appellant's Br. at 12. The Agreement also defined "Related Technology," explaining that the term encompassed "all existing technology . . . necessary to the performance by the DOS Products of their intended functions or purposes." J.A. 1965.

As contemplated, Caldera filed suit against Microsoft the same day the Agreement was signed, alleging harm to "DR DOS and related PC operating system software." J.A. 1955. Three and one-half years later, in January 2000, Microsoft settled Caldera's lawsuit. In exchange for being released from Caldera's claims against it, Microsoft paid Caldera $280 million. Per their agreement, Caldera provided Novell with about $35.5 million of this settlement.[4]

B.

In November 2004, Novell filed the six-count antitrust action underlying this appeal.[5] As relevant here, Count I asserted that Microsoft had "engag[ed] in anticompetitive

---

[4] Novell sued Caldera's successor in interest seeking a larger share of the settlement and ultimately received an additional $17.65 million. See generally Novell, Inc., 92 P.3d at 768.

[5] The complaint was originally filed in the federal district court for the district of Utah. In May 2005, the Judicial Panel on Multidistrict Litigation transferred the suit to the district of Maryland.

conduct to thwart the development of products that threatened to weaken the applications barrier to entry" to the operating systems market.[6]  J.A. 100.  Specifically, it contended that Microsoft's conduct had damaged "Novell's WordPerfect word processing applications and its other office productivity applications in violation of Section 2 of the Sherman [Antitrust] Act, 15 U.S.C § 2."  Id.  In Count VI, Novell alleged that Microsoft had made exclusionary agreements with original equipment manufacturers, which restricted the licensing of Novell's software applications, in unreasonable restraint of trade.

In June 2005, the district court granted Microsoft's motion to dismiss Counts II, III, IV, and V as untimely.  However, it

---

[6] The "applications barrier to entry" refers to the role software applications can play in insulating an operating system marketer from competition.  We discussed this barrier to entry in detail in our previous decision in this case, explaining,

> the "applications barrier to entry"-stems from two characteristics of the software market: (1) most consumers prefer operating systems for which a large number of applications have already been written; and (2) most developers prefer to write for operating systems that already have a substantial consumer base.  This "chicken-and-egg" situation ensures that applications will continue to be written for the already dominant Windows, which in turn ensures that consumers will continue to prefer it over other operating systems.

Novell, Inc., 505 F.3d at 306 (quoting United States v. Microsoft Corp., 253 F.3d 34, 55 (D.C. Cir. 2001)).

found that Novell had antitrust standing to proceed on Counts I and VI. In doing so, the court expressly rejected Microsoft's argument that Novell had assigned its claims under Count I to Caldera as part of the sale of the DOS products. The court explained:

> The fallacy in [Microsoft's] argument is that the claim asserted in Count I, while arising from Microsoft's monopoly in the operating system market, is for damage not to DOS or any other operating system but for damage to applications software. It is a far stretch to infer (and Microsoft has presented nothing to establish) that simply because DOS competed in the operating system market, such a claim was either a "direct" or "indirect" claim intended to be transferred from Novell to Caldera.

J.A. 108 (emphasis added). The district court subsequently granted Microsoft's request that it certify its ruling for interlocutory review.

In October 2007, we affirmed the district court's dismissal of Counts II, III, IV, and V, as well as its determination that Novell had standing to bring Counts I and VI. See Novell, Inc., 505 F.3d at 322-23. In a brief footnote, we acknowledged Microsoft's assertion that Novell had assigned its claims under Counts I and VI to Caldera and the district court's rejection of that argument. Id. at 306-07 n.10. However, because the issue was not before us, we declined to reach it. Id. at 307 n.10 (observing that our narrow grant of interlocutory appeal did not include issues related to the transfer of Counts I and VI).

8

Following our decision, the parties completed discovery on Counts I and VI and filed cross-motions for summary judgment. On March 30, 2010, the district court granted Microsoft's motion for summary judgment.

As to both Count I and Count VI, the district court reversed its earlier interpretation of the Agreement. It specifically concluded that its prior determination that Novell did not assign its claims under these counts to Caldera because they focused on harm to its software applications rather than operating systems was wrong. The court now felt that the reference to "associated" claims encompassed Counts I and VI, because, inter alia, "the reason Microsoft allegedly engaged in the conduct causing the damage [asserted in those counts] was to obtain and maintain its monopoly in the operating system market--the market in which the DOS Products competed." J.A. 371.

However, out of an abundance of caution, recognizing that we might disagree with its new interpretation, the district court nonetheless proceeded to "address the substantive viability of Novell's claims" to facilitate our review of their merits on appeal. J.A. 369. It concluded that, if Novell had not assigned Counts I and VI to Caldera, only Count I would have survived summary judgment. The court found, however, that Novell had failed to adequately plead harm to the software

9

application "GroupWise" in Count I and so dismissed that portion of its allegations. This appeal followed.

## II.

On appeal, Novell renews its argument that the Agreement did not transfer its Count I claims related to the office productivity applications. Novell further disputes Microsoft's assertion that Novell's participation in Caldera's settlement precludes it from litigating Count I under principles of res judicata. It also contests Microsoft's claim that there are, in any event, no disputed issues of material fact as to Count I. Finally, Novell urges that its complaint provided sufficient notice of its allegations related to GroupWise.[7]

We consider each argument in turn. In doing so, we review the grant of summary judgment de novo and affirm only if there is no issue of material fact and Microsoft is entitled to judgment as a matter of law. Robinson v. Clipse, 602 F.3d 605, 607 (4th Cir. 2010).

---

[7] Novell's opening brief did not argue that the district court erred by granting summary judgment as to Count VI, and Novell confirmed in oral argument that it was not pursuing this claim.

A.

We first address whether Novell assigned the claims it seeks to bring to Caldera. As the Agreement specified that it is "governed in all respects" by Utah law, J.A. 1980, we begin our analysis by outlining that state's legal framework.

1.

When construing an agreement, Utah courts "look to the language of the contract to determine its meaning and the intent of the contracting parties," and "'consider each contract provision . . . in relation to all of the others, with a view toward giving effect to all and ignoring none.'" Café Rio, Inc. v. Larkin-Gifford-Overton, LLC, 207 P.3d 1235, 1240 (Utah 2009) (quoting Green River Canal Co. v. Thayn, 84 P.3d 1134, 1141 (Utah 2003)) (alteration in original). In conducting their assessment, Utah courts consider "the reasonable expectations of the parties, looking to the agreement as a whole and to the circumstances, nature, and purpose of the contract." Green River Canal Co., 84 P.3d at 1142 (quoting Peirce v. Peirce, 994 P.2d 193, 198 (Utah 2000)).

Utah's approach to the issue of ambiguity in a contract is somewhat unique. See Daines v. Vincent, 190 P.3d 1269, 1276 (Utah 2008) (citing the Utah Supreme Court's efforts "to establish a balanced, 'better-reasoned' approach to an analysis of facial ambiguity that would allow judges to 'consider the

11

writing in the light of the surrounding circumstances'") (quoting Ward v. Intermountain Farmers Ass'n, 907 P.2d 264, 268 (Utah 1995)). Utah courts employ a two-step approach to determine whether a contract is facially ambiguous. First, they assess "any relevant and credible extrinsic evidence offered to demonstrate that there is in fact an ambiguity." City of Grantsville v. Redevelopment Agency of Tooele City, 233 P.3d 461, 470 (Utah 2010) (internal quotations omitted); see also Ward, 907 P.2d at 268 (reasoning that absent such evidence "the determination of ambiguity [would be] inherently one-sided, namely, it [would be] based solely on the extrinsic evidence of the judge's own linguistic education and experience" (internal quotation marks omitted)). They then determine whether "competing interpretations are reasonably supported by the language of the contract." Daines, 190 P.3d at 1277 (internal quotation marks omitted). Although the process allows extrinsic evidence on the question of ambiguity, the Utah Supreme Court has cautioned that "a finding of ambiguity will prove to be the exception and not the rule." Id. at 1277 n.5.

2.

Against the backdrop of Utah's principles of contract interpretation, we now consider the relevant provisions of the Agreement. The parties dispute whether the language "associated directly or indirectly with any of the DOS Products or Related

12

Technology," J.A. 1967, transferred Novell's claim of harm to its office productivity software. We conclude that it did not.

Microsoft argues that the phrase "associated directly or indirectly" is to be read broadly and, consequently, forecloses Novell's present claims. In support of its contention that the Agreement transferred these claims to Caldera, Microsoft cites six "associations" between the DOS products and the office productivity software, most prominently that Count I "links injury allegedly inflicted by Microsoft on [software products] with harm to competition in the PC operating system market, and thus with DR DOS, <u>which competed in that market</u>."[8] Appellee's Br. at 34 (emphasis added).

Microsoft's argument is not without some intuitive merit. The phrase "associated directly or indirectly" can be read

---

[8] The five additional purported "associations" identified by Microsoft are: (1) despite Novell's claim that it was no longer marketing its operating system when the conduct alleged in Count I began, the value of its DOS products would still have been affected by Microsoft's alleged efforts to bolster the applications barrier to entry; (2) despite the limited volume of sales, Novell sold DOS products during the period at issue, and the value of those products was affected by the conduct alleged in Count I; (3) Caldera's suit against Microsoft sought injunctive relief in the form of disclosure of technical data that would have "addressed much of the alleged conduct underlying Count I," Appellee's Br. at 37; (4) the conduct alleged in Count I was supposed to have occurred in a market that Microsoft dominated because of anticompetitive behavior toward Novell's DOS products; and (5) Microsoft targeted Novell in part because Novell had entered the DOS business.

broadly. Caldera's DOS claims and Novell's software application claims are certainly "associated" in some sense of the word; both sets of products have roles to play--although distinct roles to be sure--in the operating systems market. The elasticity of the phrase is not, however, unlimited.

We conclude that Microsoft's argument fails for two reasons. First, Utah law mandates that we not read contractual provisions in isolation. We instead consider the disputed language in the context of the agreement in which it appears. See Café Rio, 207 P.3d at 1240.

Here, the disputed language is cabined by reference to a specific set of property, transferring claims "associated directly or indirectly with any of the DOS Products or Related Technology." J.A. 1967 (emphasis added). The Agreement precisely delineated what that property consisted of, by identifying thirteen products, none of which is the office productivity software that forms the basis of the present claim. Viewed in this context, Microsoft's expansive reading of the disputed provision is antithetical to the carefully limited "circumstances, nature, and purpose" of the Agreement. Peirce, 994 P.2d at 198; see also Green River Canal Co., 84 P.3d at 1142; cf. Grynberg v. Questar Pipeline Co., 70 P.3d 1, 8 (Utah 2003) ("[W]hen two statutory provisions appear to conflict, the more specific provision will govern over the more general

14

provision.") (quoting <u>Perry v. Pioneer Wholesale Supply Co.</u>, 681 P.2d 214, 216 (Utah 1984)).

More fundamentally, Microsoft's preferred reading lacks a logical limiting principle. Given operating systems' ubiquitous role in personal computing, it is difficult to imagine a piece of hardware or software that could not be somehow "associated" with Novell's DOS products under Microsoft's capacious theory. Tellingly, Microsoft's counsel was unable to articulate meaningful boundaries for the company's reading at oral argument. Counsel argued only that the disputed language would not extend to "causes of actions associated in such a far-reaching way that it would be illogical to connect them to DR-DOS." We agree that the language of the contract must be cabined by the limits of logic. However, given the context in which the disputed phrase appeared, we believe Microsoft's reading exceeds those boundaries.

As the district court initially recognized, the express purpose of the Agreement was to assign to Caldera the rights and liabilities associated with "the DOS Products or Related Technology," J.A. 1967, a carefully delineated term. The precise phrasing of the contract entitled Caldera to sue (and share the recovery with Novell) for claims involving its operating system products, but did not preclude Novell from suing for <u>separate</u> harm to the <u>separate</u> interest in the software

applications it retained. Indeed, our prior decision was premised on the severability of harms to software from harms to DOS products, as we anchored our standing analysis in Novell's ability to articulate discrete antitrust harms to its office productivity applications, though those products did not themselves compete with operating systems. See Novell, Inc., 505 F.3d at 320. The dissent's characterization to the contrary, it is the notion that an Agreement that purported to transfer a specific set of property in fact evinced Novell's intent to transfer claims for a wholly separate property interest that, in this context, makes little sense.

To the extent that Utah law endorses review of extrinsic evidence, the available materials only reinforce our conclusion that the Agreement unambiguously supports Novell's reading. As Novell notes, the record includes affidavits and testimony from Caldera's negotiator, Novell's general counsel, and Novell's CEO, which attest to the absence of any intention to convey Novell's present claims. For instance, Caldera's negotiator's affidavit states:

> Neither party contemplated that claims "directly or indirectly" related to "the DOS Products or Related Technology" would include Novell's antitrust claims for harm to its business applications. Any suggestion that the Asset Purchase Agreement conveyed claims for harm to Novell's applications would be contrary to the parties' intentions and what I and my client, Caldera, understood was actually being conveyed to it.

16

J.A. 5024 (emphasis added).

For its part, Microsoft cites extrinsic evidence that, prior to its agreement with Caldera, Novell contemplated a jury "piggyback[ing]" damages in the applications market to a DOS-related antitrust suit. J.A. 1443. Microsoft claims that that suit was ultimately brought by Caldera as Novell's "proxy." Appellee's Br. at 42. It further urges that the fact that Caldera sought injunctive relief that would have indirectly benefited Novell's applications business demonstrates that the parties' "assignment was intended to encompass all claims arising out of Microsoft's allegedly anticompetitive conduct." Id. at 41.

We do not find Microsoft's showing persuasive. Indeed, Microsoft's extrinsic evidence is equally susceptible to the opposite reading, that is, that Caldera's failure to seek damages for harm to office productivity applications indicates that neither party contemplated the transfer of claims related to that discrete set of property--a conclusion that is entirely consistent with the testimony on which Novell relies. Having considered both parties' extrinsic evidence in the context of the contractual provisions discussed above, we do not believe that Microsoft's "competing interpretation[]" is "reasonably supported by the language of the [Agreement]." City of Grantsville, 233 P.3d at 471 (quoting Daines, 190 P.3d at 1269).

17

In short, our reading of the entire Agreement, as well as the extrinsic evidence persuades us that the district court's initial interpretation was correct: the Agreement conveyed claims "associated" with an expressly enumerated body of property that did not include Novell's office productivity applications. The mere existence of a possible conceptual link between the DOS products and those applications does not mean that the Agreement divested Novell of the claims alleged in Count I.

B.

Microsoft's res judicata argument also lacks merit. Microsoft urges in particular that Novell's participation in the Caldera litigation, and acceptance of a portion of the settlement in that case, precludes it from asserting additional claims, which Microsoft alleges arise out of the same basic core of operative facts. See Laurel Sand & Gravel, Inc. v. Wilson, 519 F.3d 156, 162 (4th Cir. 2008) ("The test for deciding whether the causes of action are identical for claim preclusion purposes is whether the claim presented in the new litigation arises out of the same transaction or series of transactions as the claim resolved by the prior judgment." (internal quotations omitted)); see also 1616 Reminc Ltd. P'ship v. Commonwealth Land Title Ins. Co., 778 F.2d 183, 187 (4th Cir. 1985).

18

Nonmutual claim preclusion is generally disfavored. See 18A C.A. Wright, et al., Federal Practice & Procedure § 4464.1, at 713-15 (2d ed. 2002). Microsoft nevertheless argues that the Caldera settlement falls within exceptions to that principle, which allow nonparty claim preclusion when there are "substantive legal relationship[s] between the person to be bound and a party to the judgment," or when the nonparty was "adequately represented by someone with the same interests who [wa]s a party to the suit." Taylor v. Sturgell, 553 U.S. 880, 894 (2008) (internal quotations omitted) (second alteration in original). We disagree.

Microsoft's somewhat confusing assertion that Novell's assignment of some of its claims to Caldera was sufficient to establish a "substantive legal relationship" between them is unpersuasive. It relies entirely on easily distinguishable caselaw that concerns situations in which a subsequent suit raises "identical issues." See Appellee's Br. at 47-48 (quoting Pelt v. Utah, 539 F.3d 1271, 1290 (10th Cir. 2008)). As discussed above, Caldera's suit addressed a distinct set of harms from those addressed in Count I: the former concerned DOS products, the latter software applications. Any appearance of identicality between the claims is a product of the level of generality at which Microsoft seeks to frame them. See, e.g., Appellee's Br. at 50 ("Both suits allege that Microsoft engaged

19

in anticompetitive conduct in the PC operating system market."); see also id. (claiming only that the two suits are "strikingly similar"). While both suits implicated Microsoft's desire to control the operating system market, overlapping motivation for separate harms is insufficient to render those harms identical for purposes of claim preclusion.

We are also not convinced that Caldera could have served as an adequate representative of Novell's interests. As the district court noted, "Caldera could not have asserted on behalf of Novell claims Caldera did not possess."[9] J.A. 376 n.9. Moreover, as a practical matter, only Novell had the incentive to recover for damages to its office productivity applications. On these facts, res judicata simply does not apply.

C.

Microsoft's claim that there are no remaining disputed issues of material fact is also unavailing. Microsoft asserts that Count I's antitrust allegations are fatally flawed, as Novell cannot make the required showing that Microsoft's conduct

---

[9] For the same reason, we reject Microsoft's argument that Novell's initiation of a separate action constitutes claim-splitting. Caldera could not have sought damages for harm to the office productivity applications in its initial suit, as it did not own those applications. As a result, Novell did not have a "full and fair opportunity" to litigate its present claims in that action. Taylor, 553 U.S. at 892; Pueschel v. United States, 369 F.3d 345, 356 (4th Cir. 2004).

20

toward its office productivity applications helped maintain Microsoft's monopoly power. In support of its argument, Microsoft cites Novell's expert in antitrust economics' testimony that, in a hypothetical market where Microsoft had only targeted Novell, "there would have been no adverse effect of knocking Novell out of the industry." J.A. 392.

Microsoft's claim mischaracterizes the impact of the expert's testimony. As the district court explained, Novell's expert's opinion about a hypothetical market leaves ample room for "a finding that Microsoft's actions toward Novell were a significant contributor to anticompetitive harm in the PC operating system market in light of the weakened state of other applications and [independent software vendors]." J.A. 393 (emphasis added). That issue is appropriate for trial.

D.

Finally, we reject Novell's argument that claims related to "GroupWise" software were adequately pleaded in Count I. To satisfy the pleading requirements, a "complaint 'need only give . . . fair notice of what the claim is and the grounds upon which it rests.'" Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010) (quoting Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam)); see also Fed. R. Civ. P. 8(a)(2) (noting that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to

21

relief"). Novell concedes that its complaint does not reference GroupWise. It nonetheless argues that it should not be penalized for having used the umbrella term "office productivity applications" to describe the software at issue. This claim lacks merit.

Given the fairly generous standards of notice pleading, the fact that GroupWise was not mentioned in Novell's lengthy complaint is not necessarily dispositive. However, Novell did not simply fail to mention GroupWise in its complaint. Rather its pleading expressly characterized what the term "office productivity applications" was intended to encompass, explaining: "Word processing and spreadsheet applications are sometimes referred to herein as 'office productivity applications.'" J.A. 51. This description, by its terms, excludes GroupWise, which "is a software program that combines e-mail, calendar, appointment scheduling, and task management functions." Action Tech., Inc. v. Novell Systems, Inc., Nos. 97-1460, 97-1481, 1998 WL 279359, at *2 (Fed. Cir. May 27, 1998) (unpublished). We cannot conclude, under these circumstances, that Microsoft was provided fair notice of GroupWise claims.

Nor are we persuaded by Novell's assertion that because Microsoft included GroupWise in its discovery requests, it was not prejudiced by any defects in Novell's pleading. As the district court found, "[w]hat material is subject to discovery

22

and what conduct may serve as the basis of a claim are two distinct inquiries with different standards." J.A. 383. We are disinclined to penalize Microsoft for having prudently sought broader discovery than may have been necessary.

## III.

For the foregoing reasons we reverse the grant of summary judgment as to Count I and remand for further proceedings.

REVERSED AND REMANDED

HAMILTON, Senior Circuit Judge, dissenting:

Between 1994 and 1996, Novell owned WordPerfect, a word processing software application, and Quattro Pro, a spreadsheet software application. In Counts II through V of its complaint, Novell sought damages for Microsoft's alleged monopolization (and attempted monopolization) of the word processing and spreadsheet software application markets, in which WordPerfect and Quattro Pro competed. These claims, all parties agree, are barred by the applicable statute of limitations under the Sherman Act. Count I, which is the subject of this appeal, seeks damages for the same claims that are time-barred in Counts II through V. More specifically, Novell alleges in Count I that Microsoft's antitrust violations in the operating systems market, which tolled the statute of limitations during the pendency of the government's case against Microsoft for antitrust violations in such market, damaged their word processing and spreadsheet software applications. The flaw in Count I is obvious: because the claim is premised on Microsoft's anti-competitive conduct in the operating systems market, Count I necessarily is a claim "associated directly or indirectly with" DR DOS. (J.A. 1966-67).

To be sure, the majority recognizes that the phrase "'associated directly or indirectly' [contained in the Asset Purchase Agreement (APA)] can be read broadly" to cover the

24

claim asserted in Count I. Ante at 13-14. However, the majority ignores the plain, patently broad language in the APA, choosing instead to craft its own narrow reading of the phrase, for two reasons.

First, the majority states that the phrase at issue "is cabined by reference to a specific set of property" that was transferred in the APA. Ante at 14. As its reasoning goes, because word processing and software applications were not part of this specific set of property, such applications could not be directly or indirectly related to the specific set. Such reasoning is flawed for the simple reason that it reads out the word "indirectly" from the APA. The word "indirectly" was inserted into the APA for an obvious reason—to allow Caldera to proceed with a claim against Microsoft that was not envisioned by the parties, but nevertheless related in some indirect manner to the DR DOS operating system. Count I fits perfectly under the APA's "indirect" umbrella. The claim is premised on harm caused, not in the software applications market in which both WordPerfect and Quattro Pro competed, but rather in the operations systems market in which both Microsoft's Windows 95 and DR DOS competed. Thus, at the very least, the harm to WordPerfect and Quattro Pro caused by Microsoft's monopolization of the operating systems market is indirectly (even perhaps directly) associated with DR DOS.

25

And it should come as no surprise that the term "indirectly" made its way into the APA. All encompassing words such as "indirectly" are commonly used in asset purchase agreements to cover such unforeseen events, and courts should read such terms broadly to ensure clarification and protection to the rights of all parties to a contract. Yet, the majority takes the opposite tack, reading an extremely broad term narrowly. Put simply, common sense tells us that a claim that only exists by virtue of Microsoft's alleged monopolization of the operating systems market is a claim "indirectly" related to the DR DOS operating system.

Second, the majority relies on certain flimsy extrinsic evidence, which, according to it, "attest[s] to the absence of any intention to convey Novell's present claims." Ante at 16. Such evidence includes the affidavits and testimony of Novell's general counsel, Novell's CEO, and Caldera's chief negotiator. Any examination of such evidence must be viewed with extreme caution, as it is undisputed that: (1) Novell sold DR DOS, in part, to allow another party, such as Caldera, to proceed against Microsoft in an antitrust action; and (2) Novell and Caldera worked in tandem in the Caldera action to litigate against Microsoft. More importantly, as the able district judge handling the case below recognized, such extrinsic evidence is "ambiguous and inconclusive," (J.A. 374), as neither party

26

contemplated the existence of the Count I claim until it became apparent that the claims in Counts II through V were time-barred. However, the absence of such contemplation does not inject any ambiguity into the APA, because, as the district judge aptly observed, Novell unmistakably assigned "claims for damage inflicted upon Novell's software applications through the prism of the operating system market," (J.A. 371), such that the harm to the software applications were indirectly associated with the operating market in which DR DOS competed. (J.A. 371).

In sum, because I believe the district judge correctly granted summary judgment in favor of Microsoft on Count I, in its thorough and convincingly written opinion, I respectfully dissent.

27